LILLIAN NORDQUIST, Appellant, v. VERNON NORDQUIST, VIRGINIA NORD-QUIST, OLGA REEVES and ROBERT N. REEVES.—14 S. W. (2d) 583.

Division Two, March 2, 1929.

*S. L. Trusty* and *Phineas Rosenberg* for appellants.

*Lyon and Lyon* for respondents.

HENWOOD, C.—This is a suit in equity filed by appellant in the Circuit Court of Jackson County. Her petition is in two counts: first, to cancel a deed to certain real estate; and second, for partition of said real estate. The chancellor found against her on both counts, and rendered judgment for respondents. She was granted an appeal to the Kansas City Court of Appeals, and, upon a hearing in that court, the case was transferred to this court, because the title to real estate is involved. [278 S. W. 810.]

Respondents filed a motion to dismiss the appeal, in the Court of Appeals, on the ground that appellant's original abstract of the record was insufficient, and, on the same day, filed an additional abstract of the record, in which they corrected the errors and supplied the omissions complained of. By filing such additional abstract, respondents waived their right to move a dismissal of the appeal. [Wimbush v. Danford (Mo.), 238 S. W. 460.] Moreover, appellant met the objections to her original abstract by filing an additional abstract. The motion to dismiss the appeal is accordingly overruled.

Plaintiff alleges, in the first count of her petition, that she and Andrew Nordquist were lawfully married on November 17, 1921, and that, at the time and prior to their marriage, Andrew Nordquist was seized of the following real estate, situate in Jackson County, Missouri:

"All of Lot Number Sixty-one (61) Wuaneta Park, an addition in Kansas City, Jackson County, Missouri, as the same is marked

and designated on the recorded plat of said addition; also all of Lot Twenty-seven (27), in Block Twelve (12), in Winter Park, an addition in Kansas City, Missouri; also all of Lots One Hundred Fifty-nine (159) and One Hundred Sixty (160), of Resurvey of Kemper Heights, an addition in Kansas City, Missouri;

That, for the purpose of defrauding her out of her dower rights therein, Andrew Nordquist and the defendant Vernon Nordquist, on December 10, 1921, caused to be recorded, in Jackson County, a warranty deed purporting to convey said real estate from Andrew Nordquist to Vernon Nordquist and purporting to have been signed and acknowledged by Andrew Nordquist on November 15, 1921; that, in truth and in fact, said deed was not signed and acknowledged on November 15, 1921, and not until after her marriage to Andrew Nordquist and after her inchoate dower right had attached; that said deed was without consideration, is fraudulent and void as to her, and casts a cloud upon her dower interest in said real estate; that Andrew Nordquist died intestate November 6, 1922, and, as his widow, she is entitled to dower in said real estate; that she and the defendants Vernon Nordquist and Olga Reeves, children of Andrew Nordquist by a former wife, are his sole heirs at law; and that the defendant Virginia Nordquist, wife of Vernon Nordquist, and the defendant Robert H. Reeves, husband of Olga Reeves, are interested in said real estate only by virtue of such marital relationships. Wherefore, she asks that said deed be adjudged null and void as to her, and thereby remove the cloud upon her dower interest in said real estate.

And, in the second count, she asks that said real estate be partitioned, by the sale thereof, and that the net proceeds of the sale be paid to her and the defendants in accordance with their respective interests.

Defendants, in their joint answer to each count of the petition, deny every allegation therein contained, and, further answering, state that the defendant Vernon Nordquist is sole and absolute owner of said real estate.

Plaintiff's reply is a general denial of the affirmative allegations of the answer.

The deed in question (defendants' Exhibit C), together with all stamps, marks and indorsements thereon, appears in the following form:

"MISSOURI WARRANTY DEED.

"THIS INDENTURE, made on the 15th day of November, A. D. One Thousand Nine Hundred and Twenty-one by and between Andrew Nordquist, a single man, of the County of Jackson, State of Missouri, party of the first part, and Vernie Nordquist, of the County of Clay, State of Missouri, party of the second part.

"WITNESSETH: That the said party of the first part, in consideration of the sum of one dollar and exchange of properties to him paid

by said party of the second part (the receipt of which is hereby acknowledged), do by these presents, Grant, Bargain and Sell, Convey and Confirm unto the said party of the second part his heirs and assigns, the following described lots, tracts and parcels of land lying, being and situate in the County of Jackson and State of Missouri, to-wit:

"All of Lot Number Sixty-one (61) Wauneta Park, an Addition in Kansas City, Jackson County, Missouri, as the same is marked and designated on the recorded plat of said Addition, also all of Lot Twenty-seven (27) in Block twelve (12) in Winter Park, an Addition in Kansas City, Missouri; also all of Lots 159 and 160 of Resurvey of Kemper Heights, an Addition in Kansas City, Missouri.

"Said Lot 61 is conveyed subject to a deed of trust now thereon given to secure a principal note of $4000 therein described.

"To have and to hold the premises aforesaid with all and singular, the rights, privileges and appurtenances and immunities thereto belonging or in any wise appertaining unto the said party of the second part and unto his heirs and assigns forever; the said Andrew Nordquist hereby covenanting that he is lawfully seized of an indefeasible estate in fee of the premises herein conveyed; that he has good right to convey the same; that the said premises are free and clear from any incumbrance done or suffered by him or those under whom he claims; and that he will warrant and defend the title to the said premises unto the said party of the second part and unto his heirs and assigns forever, against the lawful claims and demands of all persons whomsoever, subject to the above described encumbrance.

"In witness whereof, the said partys of the first part have hereunto set his hand and seal the day and year above written.

(Signed) ANDREW NORDQUIST. (Seal)

" (On the face of said deed are five-one dollar cancelled revenue stamps, bearing the following cancellation: '11-15-21 A. N.')

" (On the back of said deed appears the following:)

"*State of Missouri, County of Jackson, ss:*

"On this 15th day of November, 1921, before me, the undersigned, a Notary Public, personally appeared Andrew Nordquist, to me known to be the person described in and who executed the foregoing instrument, acknowledged that_____executed the same as his free act and deed. And the said Andrew Nordquist further declared himself to be single and unmarried.

"In Testimony Whereof, I have hereunto set my hand and affixed my official seal at my office in Kansas City, Mo. the day and year last above written.

(Signed) GEO. B. STROTHER.<br>Notary Public in and for

(Seal)                    said County and State.

My term expires May 3, 1924.

1250

"*State of Missouri, County of Jackson, ss*:

IN THE RECORDER'S OFFICE.

I, Charles H. Moore, Recorder of said County, do hereby certify that the within instrument of writing was, at 11 o'clock and 41 minutes A. M., on the 10th day of December A. D., 1921, duly filed for record in my office, in book B 2249, at page 45.

"In Witness, Whereof, I have hereunto set my hand and affixed my official seal at Kansas City, Mo. this 10th day of December, A. D., 1921.

(Signed) CHARLES H. MOORE, Recorder.

By J. L. SULLIVAN, Deputy.

(Seal.)

"(On the outside of said deed appear the following words and figures):

McL.

A—42662

WARRANTY DEED.
From
Andrew Nordquist
to
Vernie Nordquist

Filed for record this 10 day of Dec. A. D., 1921, at 11 o'clock 41 Minutes A. M. Recorded in Book_____ at page _____

CHARLES H. MOORE, Recorder,

By J. K. MORRISON, Deputy.

Recorder's Fee, _____$1.00
.40

B—2249 P—45"

The property described as "Lot Number Sixty-one (61) Wauneta Park, an Addition in Kansas City," was located at 4000 Bellefontaine Avenue, and will hereinafter be referred to as the Bellefontaine property, or the Bellefontaine house.

According to the testimony of plaintiff, she and Andrew Nordquist were lawfully married on November 17, 1921, and at that time she was living at 1005 Harrison Street in Kansas City. Prior to their marriage, they were looking for a home, and, on November 12, 1921, he took her to the Bellefontaine property and bought it for their home. He bought the piano in the house and gave it to her for a Christmas present, and also bought and gave to her two bed-spreads. She assisted him every day, from November 12th to November 17th, in getting the house ready for occupancy, and he did not leave the house at any time on November 15th. Immediately following their marriage on November 17th, they began to occupy the house as their

home. On November 28th, eleven days after their marriage, her husband came to her room at 1005 Harrison Street, where she had gone to get some things, and asked her to go to Mr. Lyon's office and sign a warranty deed and a bill of sale, and offered to give her $1,000 (Liberty Bond for that amount) if she would do so. She refused to sign the papers mentioned, and he became angry and tore the papers into pieces and threw them on the floor. She kept these papers in pieces and identified them at the trial, the pieces of the warranty deed being plaintiff's Exhibits 1, 1-A, 1-B and 1-C, and the bill of sale being plaintiff's Exhibit 2. The warranty deed and the acknowledgment thereof are dated November 28, 1921, and the deed covers a conveyance of the same real estate and on the same terms as that covered by the deed in question (defendants' Exhibit C), and Andrew Nordquist and Lillian Nordquist (plaintiff) are named as grantors and Vernie Nordquist as grantee therein. The deed is not signed, and the acknowledgment, purporting to have been taken by A. Standford Lyon, notary public, is canceled. In this connection, it is admitted that the grantors did not appear before the notary public, and that the notary's certificate as to the acknowledgment, originally written in anticipation of the execution of the deed, was canceled before the deed was taken from the notary's office. The bill of sale covers a transfer of the furniture in the Bellefontaine house from Andrew Nordquist and Lillian Nordquist (plaintiff) to Vernie Nordquist. She also identified plaintiff's Exhibit 3, being a warranty deed, covering the conveyance of the Bellefontaine property from Laura L. Jones to Andrew Nordquist, for a consideration of $9750, signed and acknowledged on November 12th, and recorded on November 14, 1921. She and her husband continued to live in the house until the latter part of January or the first part of February, 1922, when she was called to Michigan on account of the illness of her father. When she returned from Michigan, about four weeks later, she found Vernie Nordquist and his wife in possession of the house. The defendants Vernie Nordquist and Olga Reeves were the children of her husband by his former wife. She refused to live in the same house with Vernie Nordquist and his wife, and she and her husband moved out. Later on, her husband bought a lot at 929 West 32nd Street in Kansas City and built a "six-room bungalow" there, which she and her husband occupied as their home for two months before his death. He died on November 6, 1922. This property, which was left to her, with a mortgage of $6,000 against it, will not sell for more than $12,000. Her husband gave her the furniture which was moved from the Bellefontaine house to the bungalow. She was appointed administratrix of her husband's estate, and she identified plaintiff's Exhibit 4 as the official inventory of his estate. The inventory shows no real estate, and attached to the inventory as a notice from Vernie Nordquist to Mr. George Peterson, one of the ap-

praisers of the estate, to the effect that certain personal property in his father's residence at 929 West 32nd Street belonged to him (Vernie Nordquist), and that his father had no interest in said personal property. She further testified that neither Vernie Nordquist nor his wife lived in the Bellefontaine house until after she left for Michigan in January or February, 1922, but, prior to that time, Vernie Nordquist's wife came there occasionally and stayed there over night four or five times. On cross-examination, she admitted that she retained her room at 1005 Harrison Street for awhile after her marriage, but said she did so for the purpose of keeping her furniture there until it could be disposed of. She also admitted that she "had another room over on Forest," but said her husband got that room for her when she returned from her Michigan trip in March, 1922. She denied that she refused to live with her husband in the Bellefontaine house, and said her trunk was there until she came back from Michigan.

Mrs. Maude Wilson, plaintiff's sister, testified for plaintiff, that Andrew Nordquist came to her apartment, on November 28, 1921, and talked to her concerning the warranty deed and bill of sale which he wanted her sister to sign. She identified the torn warranty deed (plaintiff's Exhibits 1, 1-A, 1-B and 1-C) and the bill of sale (plaintiff's Exhibit 2) as the papers he showed her on that day. He asked her if her sister would sign these papers for $1,000, and she said to him: "No, if my sister signs it, she is crazy." He told her he came there from Mr. Lyon's office, and, later, she advised her sister to consult Mr. Houston, of counsel for plaintiff at the trial. After Mr. Nordquist left her apartment, she went out through the back door and reached her sister's room, at 1005 Harrison Street, before he did, and told her sister not to sign the papers. Upon his arrival there, she left him and her sister alone in the room for a few minutes, and, when she went back into the room, he had torn the papers into pieces, and he said to her: "Damn you, you are the cause of this." In the conversation that followed, he said: "He had bought my sister a home, fitted up with every electrical contrivance there was, to her benefit." He came to her apartment first on that occasion, instead of going to her sister's room, because her sister stayed at her apartment "the biggest part of the time." He and her sister lived in the Bellefontaine house until her sister left for Michigan, in January or February, 1922, and then Vernie Nordquist and his wife moved in.

George B. Strother, who was called as a witness for plaintiff, testified that he took the acknowledgment of Andrew Nordquist to the deed in question (defendants' Exhibit C), and that he signed the certificate thereof, but said he kept no record of acknowledgments and did not remember who brought the deed to his office.

For the defense, Mrs. Laura Jones identified defendants' Exhibit A as the contract made and signed by her and Andrew Nordquist,

covering the sale of the Bellefontaine property, together with her piano, curtains and draperies, and other personal property, to Andrew Nordquist, for the sum of $9750, as follows: $500 upon the signing of the contract, $5250 upon delivery of the deed, and the payment of a mortgage of $4000. This contract is dated October 22, 1921. She testified that Mr. Nordquist said that he was making the deal for his son; that his son, who was in the country, was buying the property, and that he was buying it for his son; that he brought his daughter to see the property, but neither his son nor his son's wife came with him at any time; that he said he was going to get married, but did not say the house was for his intended wife; that plaintiff came with him to look at the house on one occasion, about the time the deal was closed; and that, after the delivery of the deed, she moved out and thought Mr. Nordquist and his wife moved in.

The defendants Virginia Nordquist, wife of Vernon Nordquist, and Robert H. Reeves, husband of Olga Reeves, testified that they went to the Pioneer Trust Company in Kansas City with Andrew Nordquist and Vernon Nordquist on October 22, 1921, and, while there, Vernon Nordquist took $13,500 in Liberty Bonds out of his lock-box and turned them over to his father, Andrew Nordquist, and told his father to go ahead and close the deal for the Bellefontaine property. They identified defendants' Exhibit B as the receipt which Andrew Nordquist signed and gave to his son, Vernon Nordquist, on that day. This receipt reads as follows:

"Kansas City, Mo., Oct. 22nd, 1921.

"Received of Vernie Nordquist, thirteen thousand five hundred 00/100 dollars of Liberty Bonds for Real Estate as follows $10,250.-00/100 for House and furniture from Mrs. Jones $2,000.00/100 for my furniture, $1,000.00/100 for my House 2935 Mercer, $250.00/100 for two vacant lots 159-160 Kemper Heights all in K. C. Mo. $13,500.00/100

"(Signed) ANDREW NORDQUIST."

They further testified that both Robert H. Reeves and Vernon Nordquist were looking for homes in Kansas City, at that time, and that Andrew Nordquist, who was a retired building contractor and real estate dealer, was trying to find a home for his son, Vernie; that Vernie's mother gave him the Liberty Bonds a short while before she died, and that she was never in business and they did not know where she got the Liberty Bonds.

Virginia Nordquist further testified that Andrew Nordquist bought the Bellefontaine property for Vernie, under the arrangement that Andrew Nordquist would take the contract and title in his name and then convey it, together with the other two pieces of real estate, to Vernie; that Andrew Nordquist brought the deed in question (defendants' Exhibit C) out to the farm and delivered it to Vernie on November 15, 1921, and that, a few days later, she came to Kansas City and took charge of the Bellefontaine property, but Vernie was

very busy on the farm and did not come there to live until after his sale, on January 12, 1922; that plaintiff's trunk was in the Bellefontaine house for awhile, but plaintiff never lived there, and Andrew Nordquist lived there part of the time, immediately following his marriage, and part of the time in the home of his daughter, Olga Reeves; and that Vernie paid something like $10,000 for the Bellefontaine property.

The defendant Vernon Nordquist testified that, in July, 1920, his mother gave him $14,000 in Liberty Bonds, in the presence of his father and sister, and, at the same time, his mother gave his sister $14,000 in notes, and also made a gift to his father. He identified defendants' Exhibit J as the bill of sale covering the transfer of the furniture in the Bellefontaine house from his father to him. This bill of sale is dated November 16, 1921, and recites a consideration of "one dollar and other good and valuable considerations." In replying to questions by the court, he identified defendants' Exhibit C, the deed in question, as the deed he got from his father, and said his father delivered it to him out at the farm, near Liberty, Missouri, on November 15, 1921. He further said, in replying to questions by the court, that he was very busy on the farm then, and did not have time to record the deed until December 10, 1921; that he turned over the Liberty Bonds to his father and took his father's receipt therefor (defendants' Exhibit B) before the contract for the purchase of the Bellefontaine property was made by his father; and that he (Vernon Nordquist) had looked at the Bellefontaine property a couple of times before he turned over the Liberty Bonds to his father. On cross-examination, he said the Liberty Bonds, which his mother gave him, were unregistered, and that he did not know where she got them, but she was a good manager; that he "thought it best" to have a bill of sale covering the furniture, because he knew his father was going to get married; that his wife moved into the Bellefontaine house a couple of days after the deal was closed, and he came in there from the farm after his sale, on January 12, 1922; that his father and his second wife (plaintiff) never lived in the Bellefontaine house; that some of the furniture he bought from his father was located, at the time of the trial, in the Bellefontaine house, and some of it in plaintiff's bungalow; that his father borrowed some of his furniture to use in the bungalow, because his father "didn't want to buy new furniture, until he saw how things got;" that his father built the bungalow for plaintiff at a cost of $25,000; that, on the day he turned over the $13,500 in Liberty Bonds to his father and took his receipt therefor, he told his father to go ahead and draw a contract with Mrs. Jones for the Bellefontaine property, and his father said he would do so; that his father paid off the $4,000 mortgage against the Bellefontaine property soon after the deal was closed, and delivered the property to him "free and clear" of the mortgage; and that he

looked at the Bellefontaine property on the outside before his father bought it, but did not go in the house nor talk to anybody there about the property.

The defendant Olga Reeves testified that her mother gave her $14,000 in notes, and, at the same time, gave her brother (Vernie) $14,000 in Liberty Bonds, and also made a gift to her father; that, in the fall of 1921, her father was looking for homes for her brother and for her, and her father bought the Bellefontaine property for her brother; that she looked at the property for her brother, and he looked at it a couple of times before her father bought it; that her father told her he got the Bellefontaine property for $500 less than her brother was willing to invest in a home; that plaintiff refused to live with her father until he built the bungalow, and only lived with him during the last two months before he died; that, immediately after their marriage, plaintiff stayed in her room at 1005 Harrison Street and her father lived in the Bellefontaine house while Virginia Nordquist, her brother's wife, was there in charge of the house; that her father told her the bungalow cost $18,000, and the lot on which it was built cost $2500. On cross-examination, she said that her mother held a $15,000 note, secured by a mortgage on a Kansas farm, prior to the time that she gave the Liberty Bonds to Vernie and the notes to her; that her father did not give her any property or money; and that he told her there was a $6,000 mortgage against the bungalow.

A. S. Lyon, of counsel for defendants, testified that, on November 28, 1921, Andrew Nordquist came to his office and said his wife (plaintiff) was dissatisfied "about Vernie getting this property," but had agreed to sign papers "so there wouldn't be trouble about the title in the future," and he identified the pieces of the unsigned warranty deed (plaintiff's Exhibits 1, 1-A, 1-B and 1-C) and bill of sale (plaintiff's Exhibit 2) as the papers he prepared for Mr. Nordquist on that day. He said that, after waiting for awhile for plaintiff to come there and sign these papers, Mr. Nordquist left his office with the papers, and that he did not see the papers again until they were produced by plaintiff at the trial. He further said that Mr. Nordquist had previously conveyed to his son the same real estate and the same personal property which these papers purported to convey from Mr. Nordquist and his wife (plaintiff) to his son. And he identified defendants' Exhibit K as the bill of sale covering the transfer of the furniture in the Bellefontaine house from Laura L. Jones to Andrew Nordquist. This bill of sale is dated November 14, 1921. He said he wrote this bill of sale and the warranty deed covering the conveyance of the Bellefontaine property from Laura L. Jones to Andrew Nordquist (plaintiff's Exhibit 3) on the day the deal was closed.

The defendants offered in evidence five insurance policies, covering insurance on the Bellefontaine property and showing the assignment of said policies from Laura L. Jones to Andrew Nordquist and the consent of the insurers thereto on November 15, 1921, and the assignment of said policies from Andrew Nordquist to Vernie Nordquist and the consent of the insurers thereto on November 16, 1921. And, in this connection, Miss Nellie Kenmuir, clerk in the insurance office, testified that, when Andrew Nordquist came to the office to make the assignments to his son, he said that he expected to be married, and that he had bought the property for his son and was deeding it to his son. They also offered in evidence another policy, covering insurance on the Winter Park property, conveyed by the deed in question (defendants' Exhibit C), and showing the assignment of said policy from Andrew Nordquist to Vernie Nordquist and the consent of the insurers thereto on November 15, 1921.

I. We will first dispose of appellant's contentions that the chancellor erred (a) in the admission and exclusion of evidence, (b) in the refusal of her declaration of law marked B, and (c) in not granting her a new trial on the grounds of surprise and newly discovered evidence.

(a) Appellant complains, in her brief, of the rulings of the chancellor in excluding her testimony as to certain declarations of her husband, Andrew Nordquist, and in permitting the defendants Vernon Nordquist, Virginia Nordquist, Olga Reeves and Robert H. Reeves, and their witnesses Laura Jones and A. R. Lyon, to testify concerning his acts and declarations, and in admitting defendants' evidence as to the assignment of the insurance policies from Andrew Nordquist to Vernon Nordquist.

No complaint is made in appellant's motion for a new trial as to the exclusion of any part or her testimony, nor as to the admission of the testimony of defendants' witnesses Laura Jones and A. S. Lyon and defendants' evidence relating to the assignment of the insurance policies. No objection was made to the testimony of Robert H. Reeves and A. S. Lyon, and no objection was made to the testimony of Laura Jones until after she had been examined and cross-examined at length as to the matters complained of, whereupon the chancellor properly ruled that the objection was "about twenty minutes too late." For the reasons indicated, appellant cannot now be heard to complain about the rulings of the chancellor in these particulars.

The objection to the testimony of Virginia Nordquist and Olga Reeves is based solely on the ground that they are parties to the

suit and interested in the result thereof. They were not parties to the deed in question, and, under the pleadings, they have no direct interest in the result of the suit. The mere fact that they are parties to the suit does not disqualify them as witnesses nor limit the scope of their testimony. [Sec. 5410, R. S. 1919.]

As to the defendant Vernon Nordquist, the surviving party to the deed in question, the record shows that, in the first instance, the chancellor limited his testimony in accordance with the statutory prohibition, as construed by this court. [Sec. 5410, R. S. 1919; Elsea v. Smith, 273 Mo. 396, 407, 202 S. W. 1071.] Later, the chancellor examined him directly as to the consideration for the deed and the delivery thereof, and he was then cross-examined along that line. However, the statutory limitation on the competency of this defendant as a witness in this case is now a matter of no importance. In view of other evidence which is clearly competent, the exclusion of his entire testimony would not change our conclusion on the merits of the case, nor could it have changed the conclusion of the chancellor. And it is a familiar rule that our appellate courts do not reverse judgments in equity because of erroneous rulings in admitting and excluding evidence, but consider the competent evidence offered and base their conclusions thereon, without regard to the rulings of the chancellor in that connection. [Rinkel v. Lubke, 246 Mo. 377, 392, 152 S. W. 81; La Rue v. Bloch (Mo. App.), 255 S. W. 321, 322.]

(b) Declarations of law serve no purpose and are of no consequence in an equity case, and so-called errors in giving or refusing them will not be considered on appeal. [Troll v. Spencer, 238 Mo. 81, 94, 141 S. W. 855.] Appellant's complaint as to the refusal of her declaration of law marked B will, therefore, be disregarded.

(c) There is no merit in the contention that appellant was surprised by the offer in evidence of defendants' Exhibit B, purporting to be the acknowledgment of Andrew Nordquist of the receipt of $13,500 in Liberty Bonds from Vernon Nordquist on October 22, 1921, and that she was entitled to a new trial because of newly-discovered evidence in contradiction thereof. Plaintiff alleges in her petition that there was no consideration for the deed in question, and, in their answer, the defendants deny this allegation and assert that Vernon Nordquist is the sole and absolute owner of the property purporting to have been conveyed by the deed. Under the pleadings, appellant was bound to anticipate proof on the issue of consideration and could not have been surprised by the offer of such proof. [Byrd v. Vanderburgh, 168 Mo. App. 112, 120, 151 S. W. 184.] Moreover, she did not claim to be surprised at the time this exhibit was offered in evidence, nor request a postponement of the hearing on that ac-

count, but took her chances on the result of the case. And it is manifest upon the face of the affidavits relating to her so-called newly discovered evidence that such evidence could not have changed the result reached by the chancellor.

II. After a very careful consideration of the whole record, it is our conclusion that the judgment rendered below is for the right parties, and that it is supported by the greater weight of the competent evidence in the case. As a foundation for the relief sought herein, appellant alleges, in her petition,  that the deed in question was not, in fact, signed and acknowledged on November 15, 1921, and not until after her marriage to Andrew Nordquist, which occurred on November 17, 1921; that there was no consideration for the deed; and that it was made and executed for the purpose of defrauding her out of her dower interest in the property thereby conveyed. In our opinion, she has failed to prove these allegations.

There is direct evidence that the deed was executed and delivered on November 15, 1921, and no direct evidence to the contrary. Appellant's own witness, Strother, admitted that he took the acknowledgment to the deed, and did not dispute the date thereof, as the same appears in his notarial certificate. It further appears that, on November 15th and 16th, 1921, Andrew Nordquist assigned to Vernon Nordquist several insurance policies, covering insurance on property conveyed by the deed, and, at that time, told one of the insurance clerks that he was deeding this property to his son. It is also shown that, on October 22, 1921, Andrew Nordquist made a contract (defendants' Exhibit A) with Mrs. Laura Jones for the purchase of the Bellefontaine property and furniture, and told her that his son was buying the property; that he was buying it for him. And two witnesses, Virginia Nordquist and Robert H. Reeves, testified that, on October 22, 1921, they saw Vernon Nordquist turn over to Andrew Nordquist $13,500 in Liberty Bonds and saw Andrew Nordquist sign and turn over to Vernon Nordquist a receipt therefor. This receipt (defendants' Exhibit B) specifies the consideration for each of the three pieces of real estate conveyed by the deed in question, including furniture in the Bellefontaine house and the house on Mercer Avenue, and it is not disputed that the respective amounts so specified represented the fair market value of said pieces of real estate and furniture at that time. The contract with Mrs. Jones (defendants' Exhibit A) and her deed (plaintiff's Exhibit 3) both recite a consideration of $9750 for the Bellefontaine house and furniture, and the receipt (defendants' Exhibit B) specifies $10,500 as the purchase price of that property, but Olga Reeves testified that her father told her he got the property for $500, less than her brother had agreed to put into a home. Other evidence offered by defend-

ants tends to show that appellant did not live with her husband until he built the bungalow, and that his son took possession of the Bellefontaine property immediately after the delivery of the deed in question.

In opposition to this defense of the deed and the good faith of the parties thereto, we have only the testimony of appellant and her sister, Mrs. Maude Wilson, to the effect that Andrew Nordquist said he bought the Bellefontaine house and furniture for appellant; that he and appellant occupied the house as their home until she went to Michigan in January or February, 1922; and that eleven days after her marriage to Andrew Nordquist, on November 28, 1921, he offered to give appellant $1,000, or a Liberty Bond for that amount, if she would sign a deed and bill of sale covering conveyances of the Bellefontaine house and furniture to his son. Mr. Lyon testified that he wrote the deed and bill of sale (plaintiff's Exhibits 1, 1-A, 1-B, 1-C and 2), and that Andrew Nordquist told him "there had been some trouble about Vernie getting this property," and he wanted his wife to sign these conveyances in order to avoid trouble about the title in the future. He further testified, on cross-examination, that "Mr. Nordquist had deeded them—not only the real estate, but also the personal property—to Vernie, prior to this time." This testimony was not objected to nor directly disputed, and it not only offers an explanation for this proposed deed and bill of sale, dated November 28, 1921, but also tends to prove that the deed in question was executed and delivered before Andrew Nordquist and appellant were married. The fact that it was not recorded until December 10, 1921, standing alone, furnishes no substantial proof in support of the claim that it was not, in fact, executed and delivered on November 15, 1921. It is a matter of common knowledge that such delays in the recording of deeds are not unusual. If, as the evidence tends to show, Andrew Nordquist acted as the agent of his son in the purchase of the Bellefontaine property, he served as a mere conduit of title and never became the owner of that property. [Fontaine v. Boatmens' Savings Institution, 57 Mo. 552.] If he did actually acquire that property as his own, there is positive proof that he was paid in full for his investment therein, and that he received a fair market price for the other property conveyed by the deed in question. Appellant admits that Andrew Nordquist was a good husband, that their matrimonial voyage was a happy one, and that he built and left to her a comfortable urban home, which she now enjoys. His children say this home cost from $20,000 to $25,000. Appellant says it would not sell for more than $12,000, and that there is a mortgage of $6000 against it. Doubtless, her good husband expected to live long enough to pay off this mortgage. These solemn admissions on the part of appellant can hardly be reconciled with the charge that the deed in question was not a bona-fide transaction,

and that her husband made the deed and gave it to the son for the purpose of defrauding her out of her dower interest in the property thereby conveyed. And the evidence as a whole does not justify that conclusion.

In accordance with these views, the judgment is affirmed. *Davis, C.,* concurs.

PER CURIAM:—The foregoing opinion by HENWOOD, C., is adopted as the opinion of the court. All of the judges concur.