RUTH E. PARKS, by Next Friend, ROSE PARKS, v. BEN F. MARSHALL, Appellant.—14 S. W. (2d) 590.

Division Two, March 2, 1929.

220

*Gallivan & Finch, A. M. Spradling* and *Ward & Reeves* for appellant.

*H. E. Alexander, W. E. Coffer, J. M. Haw* and *William P. Powers* for respondent.

DAVIS, C.—This is an action for the breach of a contract of marriage. The jury returned a verdict for $15,000 in favor of plaintiff, and defendant appealed from the judgment entered on the verdict.

The facts submitted in behalf of plaintiff warrant the finding that plaintiff, then a young woman in her nineteenth year, still attending school, came in contact with defendant in the fall of 1923, in Charleston, Missouri, where plaintiff resided. However, she had previously met him in January, 1923. Defendant's purpose in Charleston was to attend a football game. After the game, defendant came to her home and they went for a drive. Subsequently she saw defendant every Sunday until the following August 22nd, except one, and during some weeks she saw him three or four times at her home. Telephone calls were frequent and daily letters were written by him to her. When defendant first mentioned marriage, she was not interested. However, on a visit to his mother's home in Cape Girardeau at his mother's invitation, during the Thanksgiving holidays in 1923, defendant asked plaintiff to marry him and she accepted

the proposal and agreed to do so. Around July 4, 1924, defendant set August 21, 1924, as the wedding day. On an occasion, while driving, defendant halted at a court house and begged plaintiff to marry him, but she refused until she had talked to her mother and had her consent. Later, a diamond engagement ring was given plaintiff. In preparing for the marriage, plaintiff prepared and purchased her trousseau. Upon her engagement becoming known, showers of various articles came from friends. On the day prior to the wedding as set, defendant informed plaintiff that his mother refused to give him a check, but he stated that he would borrow the money and appear. However, he did not appear. Subsequently, in September, defendant twice called her over the telephone to explain, but she refused to permit an explanation. He said nothing about calling off the wedding, but said he would visit her. He never did so. She said she was humiliated. She did not engage to marry defendant to get his money or because he possessed property. She said she thought he was able to make a marriage contract. She said he was a wonderful driver of a car; also, that he carried money with him. No one but plaintiff accompanied him on drives, nor was he under restraint of any kind. She never heard that defendant was incapable of making a marriage contract until after suit was filed. Defendant showed her some land and said that after he became twenty-four he would obtain his interest therein. He said that he was going to work and help in running the business and the store.

Plaintiff's mother testified that she told plaintiff that defendant's mother on a visit told her that she came seeking her aid to prevent a marriage. The court refused to permit the evidence that defendant's mother told her, in plaintiff's presence, that defendant was mentally deficient, of unsound mind and incapable of marriage.

Defendant was put on the stand by plaintiff, and, in addition to stating his name and that he was the defendant in this case, he stated that he was the son of Ben F. Marshall, deceased, who died nine years ago; that he had a sister named Elizabeth; that his mother's name is Florence Marshall; and that his father died while they were living at Cape Girardeau.

Defendant's evidence tended to show through witnesses the following. George D. Eaton, president of Western Military Academy, testified that defendant was eighteen years of age when he entered the institution, and that he had the mental capacity of a boy under thirteen years of age; that he did not meet the requirements for promotion to the eighth grade. He was not a trouble-maker, but merely lacked ability to learn. He was first put in the eighth grade and demoted to the seventh grade, and the only passing grade he made was in penmanship. However, he was permitted to visit Alton as were the other boys.

Ralph L. Jackson, superintendent of the Western Military Academy, stated that in intellect defendant was a great deal below the average. He was demoted to the seventh grade from the eighth, even after receiving special instruction. He spent two years in the seventh grade, and did not do as well in the second year as in the first, and made a passing grade only in penmanship. In mentality, he was classified as border-line between dull and feeble-minded. Defendant was inclined to be untruthful and to be nasty in his thoughts and conversation, but outside of that he made no trouble. He had enough sense to fit into the organization without trouble.

Dr. Frank R. Fry, of St. Louis, a specialist in nervous and mental diseases, testified he first saw defendant July 20, 1921, and examined him. His conclusion then was that he was a person of physical and mental inferiority. He was eighteen years of age at that time. He classified him as a moron of inferior or unstable mentality, and particularly defective in his ethical or moral sense. He recommended that he be kept in an institution continuously until he reached his majority, particularly to protect him and his mother and the public in general from a mentality of that kind. He also examined him in November, 1924. The defendant is mentally and congenitally defective. He was born an inferior individual, and in a case like that, there is no hope for ultimate recovery. It cannot be cured by medicine or medical treatment. He will never be sound mentally. Morons often show a mental acuteness and a certain kind of superficial smartness. So far as he knows, defendant did not show smartness of that kind. Morons as a class are considered dangerous to be at large. The majority of them have criminal propensities. He had no misgivings about the unsoundness of defendant's mind. He did not believe that defendant could be proved legally insane before a jury, that is, in a legal sense, but he would not hold him responsible for any act he committed. He was, in his opinion, of unsound mind. Generally an individual of that kind should not marry, if preventable. Their offspring are mentally and physically defective, and statistics show they are imbecilic and idiotic.

Dr. Leland B. Alford testified that the chief indication in defendant of some nervous disturbance was an oscillation of his eyeballs and cold, clammy hands. He obtained the impression that he was a mental defective, and came to the conclusion that he was a moron. A moron signifies a moderate defective condition. An imbecile or idiot signifies a very great defective condition. A moron often passes for normal on superficial acquaintance. He was of a type that makes up a great many delinquents, and they often get in jail and are criminals. They are impulsive in their actions, and do not consider the consequence. They cannot appreciate the trouble their acts may bring upon them, and the condition is caused by their men-

tal deficiency. The offspring of a man of that type are apt to be mentally defective, and very frequently they produce idiots, imbeciles and mental deficients. It occurs in a large percentage of cases. The books teach that they should be held under restraint.

Dr. Arthur H. Deppe, connected with the St. Louis City Hospital and St. Mary's Hospital of East St. Louis as visiting neurologist, testified that defendant's mental development on November 1, 1924, was that of a nine-year-old child, according to the Binet-Simon test. Beyond that age he was unable to answer questions. If a man of that type marries the same type that he is, the chances are the children would be imbeciles or, as laymen would say, idiots. Where they mate with normal mental individuals, some of their offspring may be all right, but there is always a strain in them that is defective. A moron acts from impulse, and he thought that this boy has very little power to reason. He acts immediately without thinking. A moron may be trained that, if he steals, he may go to jail, and he may not steal if he thinks he is going to jail. They have not a normal moral feeling between right and wrong. They refrain from doing an act because of fear of punishment.

Dr. U. P. Haw, of Benton, Scott County, testified that he had known defendant since birth, but only intimately during the last four or five years. It was at his suggestion that he was examined by Dr. Fry. The witness made an examination and found defendant below normal. He had a rapid heart and nystagmus, a rocking motion of the eye. His skin was cold and clammy. He was easily excited and inclined to exaggerations. His conclusion was that defendant was mentally defective and there was no question about it. A moron is one who has an idea somewhat above an imbecile, just a degree higher, not more than one degree higher than an imbecile. Morons reason out propositions or act by impulse and suggestions, and they are easily influenced. There is a probability that their children will be imbeciles or idiots.

Witness Parker testified that this boy's habits and actions indicated that he was mentally deficient. Upon being asked to state what these habits and actions were that made him reach this conclusion, he replied, "Well, he seemed to be very radical in his statements and exaggarated a great deal and he was not recognized among business people as being responsible." The answer was stricken out on motion.

Witness Hal Galeener was asked the question, "I want you to state to the jury what acts and conversation and talks you have noticed in him as indicating his mental condition." An objection that a proper foundation was not laid was sustained.

Witness Warren M. Richardson, twenty-two years of age and a resident of Cape Girardeau, testified, by deposition, that he was then

residing at United States Military Academy, West Point, New York. He had known defendant about seven years and plaintiff about one year. He was asked to tell the different acts and conduct of defendant, if any, to indicate his mental deficiency. The court sustained an objection that it was immaterial and called for the conclusion of the witness, and for the further reason that it invaded the province of the jury. The said testimony, so admitted and not read to the jury on account of the ruling of the court, is as follows: His mental condition is characterized by certain physical mannerisms, very peculiar movement of and rolling of eyes, crouching tilt of head and shoulders, unstable walking and general slouch of body, cold, clammy appearance of and nervous twitching of hands. In conversation he changed from one topic to another, and hardly ever accomplished what he set out to do. He is very excitable and habitually exaggerates beyond all reason, making rash and absurd promises that he never attempts to fulfill. He shows no trace of even elementary learning, although he had spent a goodly part of his life in school. He is easily influenced and especially afraid of a threat. He bragged a great deal and was reckless in his talks about automobiles he intended to buy, and the great speed at which he drove them, often saying that he had driven to Charleston to see his girl, a distance of thirty-five or forty miles, in twelve minutes. He characterized defendant as having a mind of a ten-year-old child, saying that he was not responsible for his actions in the environment which his age created for him.

Witness knew plaintiff. He met her in July, 1924, and saw her frequently during July and August. He was in the same party or alone with her from thirty to forty times during that period, sometimes for the duration of a half a day, and at other times only an hour or so. Usually the defendant would be with him. Witness was then asked what plaintiff's and defendant's conduct and actions toward each other were at these times. The court sustained an objection that it calls for a conclusion of the witness. However, his deposition tends to show that, whenever they could not settle their troubles, defendant would ask him to intervene and help him out. That was why he became so intimately acquainted with them and their love affair. Defendant would excuse himself after arranging for witness to drive off with the plaintiff by himself. He said he had the honor of their separate confidences in their entirety. He said that plaintiff finally told him that she did not love defendant at all, and that she intended to marry him solely because of his money. On one occasion when they had a bit of trouble, defendant got out of the car at the Russell Hotel, took him aside and asked him to take the plaintiff out and get her in a good humor. Witness drove about a mile out of town with plaintiff. She stated to witness, ''Warren,

you know I don't love Ben F.—I could not love him. He is not in his right mind. No one could love him. I am only marrying him for his money.'' After that she told him with a shudder how she detested the thought of living with him, and added, ''But you know he is a heavy drinker, so may be he won't last very long.'' He then told her that she was going to ruin her life by marrying Ben, and tried to dissuade her, but she said it was too late to back out of what she began as a mere harmless gold-digging game. Besides, she said it would be embarrassing, and that her family would not let her back out then. The above took place some time about the first of August of last year and was repeated in various forms at other times. At one time she said, in reference to his drinking, ''I will see that his cellar is well supplied.'' The foregoing was stricken out by the court as incompetent for any purpose in this case.

Defendant's mother testified that defendant was born October 9, 1902, and was a seven-months' baby, weighing only three pounds. He started to school when seven years old, and went to school until 1923. He attended the schools at home until fourteen years of age, and then was sent to Christian Brothers College in St. Louis, Stanton Military Academy in Virginia, and to Western Military Academy at Alton for two years. The court sustained an objection of plaintiff to the following testimony: That defendant, on becoming angry, would bump his head against the wall, and that he had done that often. He bumped himself so hard that you could hear it all over the room. She allowed him to drive a car. Defendant can read writing, and writes and receives letters and reads them. He does not read books, because he does not see well. She never attempted to have defendant declared of unsound mind, and made no attempt to have him restrained or treated. Witness stated that she ascertained the relations between plaintiff and defendant from her daughter, and that neither plaintiff nor defendant told her of an engagement. In March, 1924, she drove to Charleston and saw both the girl and her mother. She told plaintiff's mother that she had had Ben examined by eminent specialists, and that they had told her that he was mentally deficient and incapable of entering into a marriage contract. The plaintiff was there at that time. She stated that she did not tell plaintiff, but told her mother, that she had a letter from Dr. Fry to the effect that defendant was mentally incompetent to marry.

Dr. A. C. Vickery testified that he examined defendant on November 18, 1924, and for the next three days. He concluded that he had the mentality of a child eight or nine years of age. He classed him as a moron. The lowest type is an idiot with a brain of a two-year-old child. The next type is that of a child from three to seven years of age. Morons are of three grades, and defendant is

of the highest type, that is, he is the highest type of an imbecile. The left side of his face is different from the right. It was the result of some trouble with his brain. Where the nerve centers have been injured, there is no cure for one so afflicted, only a development to a certain stage; they never grow up. They only obtain a superficial knowledge, and some times they are smart in certain things but unable to reason. They are more capable of mimicry. The offspring of one afflicted as is defendant are, in most cases, feeble-minded and imbeciles. The driving of an automobile by defendant could be attributed to mimicry.

Other pertinent facts, if any, will be adverted to in the opinion.

I. Plaintiff has filed a motion to dismiss the appeal on four grounds.

(a) The first complains that neither the abstract of the record nor the bill of exceptions is certified by the clerk as Rule 14 and Section 1479, Revised Statutes 1919, provide. In our practice in civil matters, we have, on appeal, the forms of long and short transcripts. The long transcripts embrace all matters of record proper with exceptions included, under the certification of the clerk of the trial court. Defendant came up by way of the short form of transcript, as Section 1479 provides he may, which included a certified copy of the record entry of judgment appealed from and the order granting the appeal. Thereafter, in accordance with Rule 14, he filed uncertified copies of the entire record, which were filed and served in time. This item is disallowed.

(b) The second ground prays the appeal may be dismissed because a certified copy of the judgment and the granting of the appeal was not filed in this court by the circuit clerk in time, as Sections 1478 and 1479 require. The dismissal of the appeal is precluded where good cause is shown, and the failure of the clerk to notify the appellant of the completion of the transcript is good cause. In this case the circuit clerk not only failed to notify defendant that the transcript had been completed, but in a letter stated affirmatively that he had not completed it in time to file it, due to the illness of a deputy and the rush of business. This item is disallowed.

(c) The third ground relates to the abstract. It is said that it fails to set forth the evidence in the form of questions and answers necessary to a complete understanding of the testimony. Plaintiff filed an additional abstract and by so doing she has waived the defects, if any, in defendant's abstract. [Wimbush v. Danford, 238 S. W. 460; Nordquist v. Nordquist, 321 Mo. 1244, 14 S. W. (2d) 583.]

(d) We see nothing in defendant's brief and statement of facts that calls for a dismissal. We think that defendant has made a fair statement of facts and that he has set forth his points in brief in numerical order, and has based his argument on the facts. It follows that the motion to dismiss the appeal is overruled.

II. The testimony of witness Richardson developed that plaintiff said, among other things, that she did not love defendant and that she detested the thought of living with him. All this proof was rejected by the trial court.

Plaintiff, however, says that error may not be predicated on its rejection, because the evidence was not only a conclusion, but that it was not followed by an offer of proof. Neither of these positions are sound. It is self-evident that the conversations were not conclusions; but statements of plaintiff relative to a matter then depending. The record constructively shows that the rejected matter was not read to the jury but was read to the court, thus clearly showing that it was intended as an offer of proof. The condition of the record acquaints both the trial court and this court with the facts defendant hoped to develop as proof. Moreover, defendant made an offer of proof when he offered to read the deposition.

We think the court erred in rejecting statements and facts relating to the conduct and acts of plaintiff as shown by the offer. While some of the facts of the witness were capable of being developed more definitely, yet it is evident that the substantive portion of his testimony was admissible. In a contract of marriage, certain implied conditions are inherent in it, unless expressly eliminated therefrom. They are that the parties enter into it with the understanding that they love, cherish and respect each other. Each is entitled, upon the consummation of the marriage, to the loving comfort and society of the other. They are conditions of the contract, and they are continuing to the time of marriage. If then, plaintiff, at the time of entering into the contract, did not love defendant or detested the thought of living with him, or discovered it before the ceremony, it was at least her duty to tell him, and if she did not do so, her conduct was tantamount to a fraud on him. This testimony was admissible not only in mitigation of damages, but as a substantive and complete defense. [Sanders v. Coleman, 97 Va. 690, 34 S. E. 621; Travis v. Schnebly, 68 Wash. 1, 122 Pac. 316.]

III. The court struck out the third paragraph of defendant's answer. It alleges, in substance, that subsequent to the contract, defendant was advised that he was a mental defective, classified as a moron, and was incapable of understanding the responsibilities of marriage, and that any offspring would likely be mental defectives and probably imbeciles or idiots. The action of the court is assigned as error.

Plaintiff, in her brief, says that the paragraph was stricken out by the court because it was based on hearsay. She further says that, even if true, it avers no fact that is a defense to the petition. We think it was a defense. The parties to a marriage contract include the woman, the man and the State. [Trammell v. Vaughan, 158 Mo. 214, 59 S. W. 79; 9 C. J. 339.] The State is vitally interested in the physical and mental welfare of its citizens, and, inasmuch as the principal cause and reason of matrimony is the design of offspring, it behooves the State to prevent, if possible, the birth of mental defectives, from which class it is said the majority of criminals and dependents come. In Shackleford v. Hamilton, 93 Ky. 80, l. c. 88, 19 S. W. 5, the court say: "While the contract of marriage is silent as to any condition, it must be implied that any subsequent change in the physical or mental condition of either party, without fault, so as to render it impossible in the nature of things to accomplish the objects of the marriage relation, will release the parties from the agreement. Impotency, insanity, or such a diseased condition of the body as would affect the offspring and endanger the life of the mother if the contract were carried out, would certainly be within this rule." The answer avers that defendant is classified as a moron and incapable of reasoning or appreciating either moral or marital responsibilities. This is equivalent to alleging that defendant did not understand or appreciate his condition; but even if he did, the State is interested in forestalling the birth of mental defectives, and consequently it is its policy to discourage marriages where that result is probable or likely to occur.

We need not elaborate upon the evidence that the court first excluded and later admitted in that regard, or hold the course pursued error, but upon a retrial, evidence relating to the likely defective condition of the offspring of such a marriage should be admitted.

IV. The trial court refused to permit non-expert witnesses to relate acts, conduct and statements of defendant before testifying as to his mental condition. It is a well settled rule of law in this State that non-expert witnesses shall relate, before being permitted to express an opinion as to the mental condition of one, as a condition precedent thereto, the facts in their knowledge upon which they base their opinion. [Hunt-

er v. Briggs, 254 Mo. 28, 1. c. 54, 162 S. W. 204; Huffman v. Huffman, 217 Mo. 182, 1. c. 230, 117 S. W. 1.] If a witness founds his opinion as to the mental condition on competent facts, then his opinion is admissible. The trial court erred in this regard.

V. The trial court erred in refusing to permit a witness for defendant to state what plaintiff said to him regarding the defective mentality of defendant. The mentality of defendant was an issue, and the fact that plaintiff stated that she knew that he was not in his right mind is admissible, at least, in mitigation of damages. However, we have heretofore discussed the admissibility of this evidence under Paragraph II of this opinion.

VI. Plaintiff introduced in evidence several documents, purporting to be filed by the trustees of the estate of B. F. Marshall. The certificate of the Circuit Clerk of Scott County certifies that the hereto attached instrument purporting to be report of Isaac H. Marshall and St. Louis Union Trust Company, as trustees for the estate of B. F. Marshall, filed in my office March 13, 1925, is the original report of said trustees filed in my office on said 13th day of March, 1924. These reports were offered for the purpose of showing defendant's wealth, and they purported to show, among other things, a small amount of cash on hand, and securities valued at par of over $900,000 in one account and nearly $200,000 in another account. Defendant objected because the reports were hearsay.

The evidence does not show that the reports were signed; or that the property was correctly listed; or that defendant was beneficially interested in the property: or the actual value of the property; or that defendant was afforded the opportunity of cross-examination. Irrespective of the foregoing, however, the reports were hearsay and inadmissible. We have found no law or statute requiring trustees, created by will, as were the trustees herein, to file reports with the circuit or any other court; nor, so far as the record shows, were the reports filed in connection with an action at law or a suit in equity, even if it could be said that they were admissible for that reason. It is true that Sections 13429 and 13430, Revised Statutes 1919, provide for the filing of trustee's reports in the circuit court where the court, under a will proved and recorded, appoints a trustee to succeed another, because he has become disqualified to act, or has resigned or died; but that is not the situation here, for the trustees were appointed by and were acting under the will. We conclude that the reports so admitted were hearsay, resulting that the court erred, for the reports were not the acts of defendant, even though he may

have been interested in the property listed therein. It was not shown that defendant read and understood the reports and that he acted upon them. [3 Jones, Commentaries on Evidence, p. 2003, sec. 1084; Rigley v. Pryor, 290 Mo. 10, 233 S. W. 828; Seibel-Snessdorf Copper & Iron Mfg. Co. v. Mfg. Ry. Co., 230 Mo. 59, 130 S. W. 288.] The foregoing also applies to the evidence relating to the Ben F. Marshall Land & Mercantile Company.

VII. Defendant complains of Instruction Five, given at instance of plaintiff. It baldly told the jury that, where experts are called to testify, their statements are not to be considered as evidence of facts, but are merely of an advisory nature, etc. This instruction fails to confine its admonition to the opinions of experts, but includes in its scope statements of facts. The evidence included facts comprehended from personal observation, resulting that such testimony did not involve opinion or expert evidence. The instruction constituted error. [Green v. Railroad, 142 Mo. App. 67, l. c. 81, 125 S. W. 865.]

VIII. The giving of Instruction Seven for plaintiff is attacked, because it conflicts with other instructions. It tells the jury that, if defendant had sufficient mind and understanding to comprehend the nature of the contract and agreement to marry and the duties and responsibilities that would entail upon him by such marriage, then the jury cannot find for defendant upon the ground of mental deficiency, and further tells the jury that the burden of proof is on defendant to prove such mental deficiency by the preponderance or greater weight of the evidence, and unless they find so, then they cannot find for defendant on that ground. It is said that the above instruction conflicts with plaintiff's Instruction Two and defendant's Instruction Ten, which are based, in part at least, on the hypothesis that plaintiff could not recover if the jury found that the offspring of such marriage would likely be morons, imbeciles or idiots. Instruction Seven does not attempt to direct a verdict, nor does it purport to cover the whole case. It merely involves one of defendant's defenses, and told the jury, in substance, that if they found defendant comprehended certain things, then they could not find for defendant on the ground that he was mentally defective. While this instruction related to one of the affirmative defenses, it was so limited, but it did not limit the effect of other instructions. The instructions harmonized and the jury were competently advised. Instruction Seven was directed to a particular phase of the issues and was supplemented by other instructions given in the case. We do not think the instructions conflict with each other. [State ex rel.

v. Cox (Mo. Sup.), 270 S. W. 113; Cassin v. Lusk, 277 Mo. 663, 210 S. W. 902.]

Other alleged errors are briefed, but, as they are not likely to occur upon a retrial, we refrain from discussing them. It follows from the discussion of the issues that the judgment must be reversed and the cause remanded. It is so ordered. *Henwood, C.,* concurs.

PER CURIAM:—The foregoing opinion by DAVIS, C., is adopted as the opinion of the court. All of the judges concur.