Lenora E. Berry, Administratrix of Estate of William W. Berry, v. St. Louis-San Francisco Railway Company, Appellant.— 26 S. W. (2d) 988.

Division Two, February 19, 1930.

*E. T. Miller* and *Mann & Mann* for appellant.

*J. M. Fisher* and *C. A. Randolph* for respondent.

DAVIS, C.—The judgment herein was based on the Federal Employers' Liability Act. It is an action for damages for personal injuries resulting in the death of plaintiff's intestate, caused by a collision between two trains operated by defendant. The petition comprised three counts, but the third count passes from consideration as it was dismissed by plaintiff at the close of the evidence. The first count prays damages for expense, loss of earnings and conscious pain and suffering of deceased from date of injury, to-wit, June 15, 1923, to date of death, to-wit, November 23, 1923. The second count asks pecuniary loss for his death. The trial resulted in a verdict of $10,000 on the first count, and $5,000 on the second count, and defendant appealed from the judgment entered thereon.

The evidence presented warrants the finding that defendant, on June 15, 1923, was a common carrier by railroad, engaged in interstate commerce. Plaintiff's intestate, on the day mentioned, was a locomotive engineer in the employ of defendant. He was assigned to engine 516, commonly called train 516, as engineer. To train 516 was assigned the duty of switching cars in the Red Plant district, adjacent to Webb City, Missouri. On the morning mentioned, plaintiff's intestate, driving engine 516, together with its crew, left Joplin, Missouri, about six:twenty A. M., and proceeded to the Red Plant switching district to switch freight cars. There the train engaged in switching cars, some of which were loaded with chat to be hauled and used in the repair of defendant's roadbed in other states. The switcher also hauled some empty cars that morning, but the record shows nothing further in regard to them. Just previous to the collision, later mentioned, which occurred that morning about ten:thirty-five A. M., switcher 516 proceeded to a siding switch to wait to permit a passenger train to pass on the main line. After the passenger train had passed, the conductor of train 516, knowing that an interstate freight train, which was four hours late, designated as train 331, was likely to be moving southwardly on the main line toward them, without informing plaintiff's intestate of that fact, ordered him to drive the engine, to which was coupled the

caboose, on the main line northwardly to Oronogo, near Webb City, to a switch called Waring, to move eight or nine empty ballast cars, to place them on siding to be later loaded. The conductor of train 516, as the train left the siding to go to Oronogo to move the empty ballast cars, stationed a brakeman there to flag a local train coming from Joplin. The brakeman testified that, while train 516 was backing up from Oronogo to the siding to permit the passenger train to pass, he heard the superintendent of defendant say to the conductor of 516, "We have got it pretty well fixed up in the west end; we would like to get out as many as we can today for the south end." When they spoke of the west end, Kansas was meant, and by the south end, Oklahoma. On the morning in question, two trips had been made to Oronogo by train 516, and it had moved cars loaded with rock and chat and placed them on sidings to be put in transit. This company chat was loaded at one of the spurs at Oronogo. At that time washouts on defendant's lines had occurred in Oklahoma and Arkansas and between Joplin, Missouri, and Neodesha, Kansas. The purpose of train 516 in going to Oronogo, at the time of the collision with train 331, is shown by the following:

"Q. What were you going there for? A. To get some empty cars; empty ballast cars.

"Q. Where were you going to put them? A. I think I was going to put them on the Good track; place them on some of them tracks down there.

"Q. To be later loaded? A. Yes."

The conductor of train 516 testified that that was all company chat that he had lined up that day.

After the passenger train passed the siding, train 516, on order of its conductor, left the siding and proceeded northwardly on the main line, and, while so proceeding, a collision occurred between train 516 and train 331, an interstate freight train, running southwardly. Train 331 was about four hours late.

A rule of defendant provided that freight trains, within yard limits, must move prepared to stop, unless the main track is seen, or known, to be clear. As train 516 proceeded to Oronogo, it was running on a curve where the vision was obscured by trees and underbrush to the right of the right-of-way. The telegraph poles were 152 feet apart. Various witnesses estimated the vision on this curve at from four to seven telegraph poles, or from 600 to 1050 feet. The effect of the testimony of Engineer Allison, who on occasions ran engine 516, plaintiff's witness, was that an engineer on an engine going north, at any place on this curve, could see at least four telegraph poles, or 608 feet. The speed of train 516, as it ran, was

estimated at from twelve to twenty miles an hour. Train 331 comprised an engine, caboose and thirty-six loaded cars, and was on its way to Kansas. It was running thirty-five to forty miles an hour as it passed Waring crossing, which was 1200 to 1500 feet north of the point of collision. Another witness stated that it was running from twenty to thirty miles an hour. The collision occurred 150 feet south of the north end of the curve, opposite milepost 323 plus 20. The track, going south, from Waring crossing to the north end of the curve was straight. A service application of the airbrakes on train 331 was made about 1100 feet from the point of collision, which slightly reduced its speed. A second service application of the brakes was made 500 feet farther south. An emergency or third application was made 150 feet from the point of collision, and the train was then going thirty miles an hour. Train 331 crashed violently into train 516, injuring plaintiff's intestate. Train 331, after colliding, moved the length of its engine, or, as one witness said, from ten to fifteen feet. The roadbed, ties and rails under the engine of train 331 were torn up, but that under train 516 was intact. By a service application of the brakes train 331 could have been stopped, going thirty-five to forty miles an hour, in from 1500 to 2000 feet, which was a reasonable stop, and by an emergency application it could have been stopped in 800 to 1000 feet. An emergency stop is never entirely safe to a freight train the length of train 331. From train 331, around the curve, the vision extended 900 to 1050 feet. Train 331 going at twenty miles an hour would require for a service stop 800 to 1000 feet, and for an emergency stop, 600 feet. A locomotive engineer testified that the circumstances called for an emergency application of the brakes. The engineer of train 331 testified that he made a service application of the air and an emergency application when notified of the approach of train 516. Train 516 was within its rights in using the main track, as was also train 331. At Oronogo junction, about a mile and a half north of the point of collision, the crew of train 331 were told that train 516 was within the Red Plant district and to look out for it, as it was expected to proceed to Oronogo to switch cars. It was the custom and duty of train 331 to blow the whistle frequently in that district while running, but train 331 did not whistle on this occasion. The engineer of train 331, defendant's witness, did not remember when he last blew the whistle previous to the collision.

The evidence in behalf of defendant tends to show that the collision occurred opposite milepost 323 plus 20. The point of collision was within the switch limits. As they started, the conductor of train 331 said to the engineer: "We want to keep a close watchout down here, because the switcher is down here somewhere." The

engineer said he handled the train at a low rate of speed all the way down through there. At Oronogo he made a light application of the brakes to keep from getting too much speed. He was not exceeding eight miles an hour at any time. The first information he had of the approach of train 516 was when the lookout, the brakeman, on the engine with him, shouted, "Somebody's coming here." He then made an emergency application of the brakes. The engineer, conductor, fireman and brakeman, all on the engine of train 331, which was running three miles an hour, then alighted in upright position from the engine without losing balance. All the airbrakes on train 331, except on two cars, were in good condition, but their condition did not affect the braking power. After setting the emergency brakes, there was nothing else that could have been done. The engine of train 331 came to a stop before the collision. It stopped within from 100 to 150 feet after emergency application. Engine 516, at the time the engineer of train 331 saw it, was two telegraph poles or 304 feet distant. It was running twenty miles an hour. There was no reduction of the speed of train 516. No application of the brakes on it was heard. The throttle of train 516 and the emergency brake were both open and in running position. The engineer of train 516 was on the seat. However, any force coming from the rear and striking the lever would release the emergency brake. The collision was violent. The engineer of train 331 stated, "I did a lot of extra whistling." It was possible that train 516 slackened its speed, but the engineer did not notice it, and it was possible that the emergency brake was applied. Going at twenty miles an hour, the engineer of train 331 said he believed he could stop it in about 300 feet. Train 516, running at twenty miles an hour, could have been stopped in from 100 to 150 feet. Train 516, when the brakeman on the engine of train 331 first saw it and notified the engineer, was something like four telegraph poles distant, he said. The fireman said it was six to seven telegraph poles distant. The brakeman of train 331 said that he did not see the engineer of train 516 in sight. It was estimated that the engineer of train 516, from where he sat, could see train 331 coming about five telegraph poles away. The curve of the track and trees prevented farther vision. Train 516 consisted of an engine and a caboose only. The conductor of train 516 ordered the engineer where and when to proceed. He told him nothing about a train coming from the north when he ordered him out on the main line. The conductor of train 516 said: "That was all company chat I had lined up that day." Other facts, if any, pertinent to the issues, will be noted later.

786

I. Respondent compiled an additional abstract of the record and served it, on April 16, 1929, on appellant. The cause was set for hearing on April 22, 1929. Appellant, on April 20, 1929, on the ground that it did not comply with Rule 11 of this court, served on respondent and later filed a motion to strike respondent's additional abstract from the record herein. Rule 11 provides, in substance, that, if appellant appeals in the short form and respondent is not satisfied with appellant's abstract of the record, he shall serve on appellant a copy and file with the clerk ten copies of said abstract at least fifteen days before the cause is set for hearing. Rule 12 of this court provides that, where a complete transcript is brought to this court in the first instance, if respondent desires to file an additional abstract, he shall deliver to the appellant a copy of same at least five days before the cause is set for hearing and ten copies with the clerk on the day preceding.

Appellant appealed according to the short form. It contends that the serving and filing of the additional abstract was not in time according to Rule 11. Appellant does not controvert any fact stated in the additional abstract, although, in his reply brief, he argues that the additional abstract states no fact not found in appellant's abstract. In the main, appellant is correct, but we cannot find in its abstract the evidence relative to washouts on its lines. Moreover, we are unable to find in the rules a penalty prescribed with respect to the failure of respondent to file an additional abstract in time, as is the case with respect to appellant's filing an abstract. [Rule 16.] Notwithstanding Rule 11, we are inclined to the view that the filing of an additional abstract by respondent is within the discretion of this court. Moreover, appellant admits in its reply brief that the bill of exceptions shows that appellant had washouts in Oklahoma and Arkansas and between Joplin, Missouri, and Neodesha, Kansas. In view of the facts herein and the admission, the motion to strike out the additional abstract is overruled.

II. Plaintiff submits that we cannot disturb the action of the trial court, in overruling defendant's demurrers to the evidence, because defendant failed to bring up all the evidence relating to the issues. By filing an additional abstract of the record, supplying what plaintiff deemed to be omissions in the evidence, the right to complain was waived. The contention is overruled. [Nordquist v. Nordquist, 14 S. W. (2d) 583; Parks v. Marshall, 14 S. W. (2d) 590.]

III. Defendant argues that the facts do not bring the action within the Federal Employers' Liability Act, because the work in ▮▮▮▮▮▮▮ which plaintiff's intestate was engaged and employed, ▮▮▮▮▮▮▮ at the time of the injury, was not interstate commerce, or so closely related to it as to be practically a part of it. We are to be guided, in our determinations, by the rules enunciated by the United States Supreme Court. In C. B. & Q. Railroad v. Harrington, 241 U. S. 177, l. c. 180, the court say: "It is not important whether he had previously been engaged in interstate commerce, or that it was contemplated that he would be so engaged after his immediate duty had been performed." In Illinois Central Railroad v. Behrens, 233 U. S. 473, it is held, in effect, that the true test, provided the employer is a common carrier by railroad engaged in interstate commerce, is the nature of the work being done by the employee at the time of the injury.

However, if the facts and circumstances develop an inference that, at the time of injury, plaintiff's intestate was engaged directly in interstate commerce, or that the nature of his work was so closely related to it as to be practically a part of it, the determination of his employment in interstate commerce was a jury question. In interpreting the evidence with respect to such an inference arising, we are aware that the facts and circumstances must develop more than a scintilla of proof, or conjecture and speculation.

In St. Joseph & G. I. Railway Co. v. United States, 232 Fed. 349, it is said, in effect, that the hauling of material by an interstate railroad to be used in the repair of its roadbed is interstate commerce. The facts develop that plaintiff's intestate was employed that morning generally and indiscriminately in interstate commerce, for he had been switching cars loaded with rock and chat thus started in transit to other states to repair defendant's roadbed. [Pittsburg, C., C. & St. L. Railway Co. v. Glinn, 219 Fed. 148.] It is a fair inference from the evidence, we think, although the fact is of little importance, that the cars loaded with rock and chat, switched by plaintiff's intestate previously that morning, were destined to the repair of its roadbed in Kansas. It is of importance, however, that defendant's superintendent directed the conductor of train 516, shortly before the collision occurred, to get out as many as possible that day for the south end, to-wit, for Oklahoma. Pursuant to the superintendent's direction and connected therewith, the record advises that plaintiff's intestate, at the time of injury, was driving engine 516 to the Oronogo siding to switch empty ballast cars to be later loaded. From the preceding facts an inference arises that the empty ballast cars, which plaintiff's intestate was then proceeding to get, when loaded with rock and chat, were that day to be hauled

788

to Oklahoma to repair defendant's roadbed. If the foregoing inference is permissible, and we think it is, the continuity of the movement of train 516, in thus going to move empty ballast cars, and the contemplated movement of said ballast cars to Oklahoma for the purpose indicated, could not be held to be broken by a temporary interruption of their movement in loading the cars. Thus it results that an inference is warranted that plaintiff's intestate, at the time of the collision, was engaged in interstate commerce. The question was for the jury.

IV. Defendant asserts that the facts fail to develop its negligence, resulting that the trial court erred in submitting the cause to the jury.

(a) The facts justified the finding that defendant was negligent in operating train 331 in violation of Rule 93, in that train 331 was moving on the main track in the yard limits in excess of a speed, that its crew could see, or know, the track to be clear, prepared to stop. Both plaintiff and defendant interpret this rule to mean that in yard limits, all, except first class trains, must move prepared to stop in half the distance that the main track was seen, or known, to be clear. Defendant refused to stand upon its demurrer to the evidence offered at the close of plaintiff's case, but went forward introducing evidence in its behalf. Consequently, in ruling on such demurrer, plaintiff is entitled to the benefit of all the evidence that tends to aid her, whether it be that of plaintiff or defendant. The evidence most favorable to plaintiff was that train 331 was going thirty-five to forty miles an hour, and that an emergency application of the brakes required from 800 to 1000 feet to stop it going at that speed. However, going at twenty miles an hour, it required 600 feet to stop it. Again, the evidence most favorable to plaintiff was that the brakeman on train 331 was watching for train 516, and that, when he first saw it, it was four telegraph poles, or 608 feet, distant. It is evident then that substantial evidence obtained that train 331 was running at the time of collision in excess of a speed that it was prepared to stop in accordance with the interpretation of the rule relied on, and that it did not so stop. Our ruling is justified, we think, by .Chicago, Rock Island & Pacific Railway Co. v. Wright, 239 U. S. 548. In addition, it follows that, as the conductor and engineer of train 331 knew that train 516 was likely to be running on the main track, a speed of from twenty to forty miles an hour, in view of the curve and the inability to see, was negligence. Moreover, knowing that train 516 was likely to be running on the same track, it was negligence for the crew of train 331 to fail to whistle and warn train 516

of its approach. [Toledo, St. Louis & Western Railroad Co. v. Allen, 276 U. S. 165.]

V. Defendant avers that the injury to plaintiff's intestate was caused directly, proximately and solely by his violation of Rule 93. The evidence most favorable to both plaintiff and defendant tends to show that, just prior to the collision, engine 516, with caboose attached, running at twenty miles an hour, could have been stopped in from 100 to 150 feet, and that the engineer of train 516, in traversing the curve going to the point of collision could see a distance of four pole lengths, or 608 feet. It is evident, therefore, that plaintiff's intestate was driving engine 516 so that he could stop within one-half the distance he could see. Consequently, he was not violating Rule 93.

VI. Defendant asserts that the record develops, as a matter of law, that plaintiff's intestate assumed the risk. The burden of proof that he assumed the risk was on defendant. [Kanawha & Michigan Railway Co. v. Kerse, 239 U. S. 576.] The assumption-of-risk rule is stated in Chesapeake & Ohio Railway Co. v. De Atley, 241 U. S. 310, l. c. 315, and Chicago, Rock Island & Pacific Railway Co. v. Ward, 252 U. S. 18, l. c. 21, thus: "According to our decisions, the settled rule is, not that it is the duty of an employee to exercise ordinary care to discover extraordinary dangers that may arise from the negligence of the employer or of those for whose conduct the employer is responsible, but that the employee may assume that the employer or his agents have exercised proper care with respect to his safety until notified to the contrary, unless the want of care and danger arising from it are so obvious that an ordinarily careful person, under the circumstances, would observe and appreciate it." The facts develop that the conductor of train 516, knowing that train 331 had not passed and that train 516 would possibly meet it, ordered plaintiff's intestate to proceed with train 516 on the main track without informing him of those facts. No evidence appears tending to show that plaintiff's intestate had reason to know that train 331 was late, or that he was likely to meet it or any other train coming south. We may infer from the evidence that he was warranted in anticipating a clear track.

As the jury from substantive evidence found defendant negligent, that question is concluded. It is evident, therefore, that plaintiff's intestate did not assume such negligence, until he was notified to the contrary, or unless it was so obvious that an ordinarily prudent person would observe and appreciate it. We are warranted, from the

evidence, in concluding that he was not notified, and did not observe either the approach of train 331 or defendant's negligence. Consequently, the question is, was the negligence of defendant so obvious that an ordinarily prudent person, under the circumstances, would observe and appreciate it? The postulate obtains that it was not the duty of plaintiff's intestate to exercise ordinary care to discover extraordinary dangers that arise from the defendant's negligence and that he was justified in assuming that defendant or its agents would exercise proper care with respect to his safety. At the time of the collision he was running on a curve with his visibility limited to about 600 feet. Without reason to expect the approach of a train coming south, but with every reason to expect a clear track, as the order of the conductor to him to proceed tends to establish, and with the postulate obtaining that he was not charged with the duty to exercise ordinary care to discover defendant's negligence, we think that the assumption of the risk by plaintiff's intestate was at least a jury question, especially in view of the fact that a few moments only intervened in which to make discovery of the approaching train. Moreover, we are inclined to the view, although it is unnecessary to determine it, that the want of care of plaintiff's intestate, if he was guilty of such, involved contributory negligence rather than assumption of risk. [Schlemmer v. Railroad, 220 U. S. 590; Erie Railway Co. v. Purucker, 244 U. S. 320.]

VII. It is complained that the court erred in refusing to give eight withdrawal instructions offered by defendant, which requested the withdrawal of certain assignments of negligence that are averred unproven or abandoned. The instructions relate to and request the court to refuse to consider the negligent operation of train 331 without ascertaining the location of train 516; the negligent failure of the operatives of train 331 to keep a proper lookout; the negligent failure of train 331 to warn of its approach; the negligent speed of train 331; the negligent failure to stop or slow down train 331 after the danger became imminent; the negligent failure of defendant to warn plaintiff's intestate that train 331 was likely to approach at the time of collision; that train 331 neglected to sound the whistle; and that the rate of speed of train 331 could not be considered as an act of negligence.

The three assignments of negligence, hypothesized in plaintiff's principal instruction, were sufficiently developed to permit a finding of them by the jury. They related to a violation by defendant of an operating rule, negligent speed and a failure to warn. It results that such withdrawal instructions as attempted to withdraw these

assignments of negligence from the jury were properly refused. Even though a certain assignment of negligence is abandoned or unproven, if a withdrawal instruction concerning the abandoned or unproven assignment of negligence either affects an assignment of negligence properly submitted to the jury, or would tend to confuse the jury, it is properly refused. As every withdrawal instruction offered would have had this effect, they were properly refused. [Unterlachner v. Wells, 296 S. W. 755; Reith v. Tober, 8 S. W. (2d) 607; Clift v. Railroad, 9 S. W. (2d) 972.]

VIII. The court refused five instructions offered by defendant. Instruction 4-R was properly refused because the question of the reduction of damages due to any contributory negligence of plaintiff's intestate was fully covered by other instructions given. Instruction 5-R should not have been given, because it assumes that the empty cars, which train 516 was on its way to haul and place for loading, were not then engaged in interstate commerce. Instruction 6-R was not based on the evidence adduced and hypothesizes a false issue, in that it places the burden of proof on plaintiff and directs a verdict for defendant if the jury found that plaintiff's intestate was not, at the time of the collision, hauling loaded cars billed and destined to a point outside Missouri. Instruction 7-R was covered by other instructions given to the jury in behalf of defendant. Instruction 8-R was also covered by other of defendant's instructions submitted to the jury.

IX. Defendant attacks plaintiff's principal instruction. It says the record wants evidence that train 331 could not have been stopped within the distance the employees of that train could have seen and known the track to be clear. It is evident that they did not know that the track was clear, for it was not. As to vision, the brakeman, who acted as lookout for the engineer of train 331, testified that he first saw train 516 approaching four telegraph poles, or 608 feet, away. The evidence develops that train 331 was running thirty-five or forty miles an hour, and that an emergency stop at this speed could not be made in less than 800 to 1000 feet. Other evidence tended to show that train 331, just prior to the collision, was running twenty miles an hour, and that it would take 600 feet to make an emergency stop. Surely this was evidence that refutes defendant's contention.

A reading of the instruction convinces us that defendant is in error in saying that it does not require the jury to find that train 331, by reason of its negligent rate of speed, ran beyond and did not stop within the distance that such employees could, by the ex-

ercise of ordinary care, have seen or known to be clear. It is true the instruction uses the words "could not be stopped," but the verbiage of the instruction construes the words as tantamount to "did not stop."

It is argued that there is no room for the submission of the rate of speed at which this train was being operated as an act of negligence. The argument is based on the postulate that the evidence establishes that the collision occurred north of a point half way between the two trains at the time the crew of each could see the other. It is true that defendant's evidence is to that effect, but it is also true that its evidence shows that train 331 was running only eight miles an hour, and was stopped in 150 feet. The evidence most favorable to plaintiff shows that train 331 was running thirty-five to forty miles an hour. It may be inferred then that train 331 did not stop in half the distance that the brakeman, who was watching for train 516, first saw it, to-wit, 600 feet distant. Even if train 331 was running not more than twenty miles an hour, the evidence shows that it required 600 feet in any event to stop it.

Defendant complains of that portion of the instruction reading: "And if you further find that said William W. Berry did not know or by the exercise of ordinary care could not know of the approach of said train 331 at said time and place, and that the employees operating said train knew, or in the exercise of ordinary care should have known, of the presence of train 516 at or near said place on said track." It argues that the inconsistencies in the above portion of the instruction are instantly apparent, for, if the crew of train 331 were cast with the duty of discovering train 516, plaintiff's intestate was also cast with the duty of discovering the approach of train 331. The crew of train 331 were warned to watch for train 516, as they were likely to meet it on the track. On the other hand, Berry had no reason to anticipate the coming of train 331 or any other train on the main track at that time, for there was no showing that any train was due. It is evident that the situations of the two crews were not the same. The running of train 331, under the evidence most favorable to plaintiff, was negligence as heretofore shown, and plaintiff's intestate was not cast with the duty of exercising ordinary care to discover defendant's negligence. Consequently, the question that Berry knew or should have known, by the exercise of ordinary care, of the approach of train 331, was properly submitted to the jury; and we see no inconsistency in the instruction as asserted.

Defendant complains of a portion of the instruction reading: "And if you further find that such employees in charge of train 331 failed to use ordinary care to warn the said William W. Berry of

the approach of train 331, if so." Defendant argues that, if Berry saw train 331 coming, then a lack of warning was not the proximate cause of the injury, for it would have been useless. Even though the instruction was not as definite as necessary in this respect, still it avails defendant nothing, for the assignments of negligence were submitted by this instruction conjunctively, and, as the other findings of negligence as submitted by the instruction cannot be held erroneous, it is evident that this portion, even if indefinite, is surplusage and ineffective as error. Moreover, defendant's evidence tends to show that Berry was oblivious of the approach of train 331. With knowledge on the part of the crew of train 331 that train 516 was likely to be running on the main track, and cast with the duty of whistling, in view of the evidence that train 331 did not whistle and Berry's obliviousness, we do not think that the jury was misled or that the error charged was prejudicial.

X. It is said that plaintiff's Instruction B constitutes reversible error for several reasons. The measure of damages is the amount Berry would have contributed to his wife during their joint lives had he not been killed. It is said that, although the instruction mentions the age and probable expectancy in life of plaintiff, it ignores her expectancy in authorizing the jury to award her such sum as they find he would have given her during his life had he not been killed. In view of the evidence that plaintiff was seven years younger than her husband and that her life expectancy was greater, the instruction in this respect was not prejudicial. Moreover, the instruction tells the jury that they should take into consideration, in fixing the damages, the age and probable expectancy in life of plaintiff. [Gill v. Railroad, 259 S. W. 93.]

It is said that the instruction is erroneous in that it did not require the jury to find that the expense incurred was reasonable for the services rendered. The instruction authorized the jury to award plaintiff damages for the reasonable expense, if any, which you may believe and find from the evidence was incurred for medical, surgical and hospital treatment, as was made necessary on account of said injuries, if any. We think the criticism is not tenable.

The next objection to the instruction reads: "The petition alleges that deceased incurred medical expense in the sum of $1464.90. The proof is that plaintiff paid the hospital and drug bills, amounting to $410.65, the bill of Dr. Grantham in the sum of $100, the bill of Dr. Neff in the sum of $53, and that Dr. Balsley's bill, which was approximately $899, has not been paid." It is argued that this evidence shows that these

claims had not been allowed in the probate court and, consequently, the payments were voluntary. The objection made by defendant on the trial was that these bills did not constitute an element of damages for which she could recover on either count of the petition. That these sums were properly recoverable cannot be questioned. The objection defendant is now urging was not urged at the trial. The point is ruled against defendant. [Exchange Bank v. Turner, 14 S. W. (2d) 425, l. c. 432.]

It is said that the reference in the instruction to the amounts prayed for as damages in the petition and thus authorized is error. On the authority of Chesapeake & Ohio Railway Co. v. Carnahan, 241 U. S. 241, the point is also ruled against defendant. These rulings also dispose of the contention that the court erred in refusing to give to the jury defendant's Instruction 17-R.

XI. At the instance of plaintiff, the court gave to the jury an instruction defining certain postulates as interstate commerce, thus authorizing the jury to find that plaintiff's intestate was engaged in such commerce if it found all the facts hypothesized therein. The facts hypothesized, with the exception of one which we have previously discussed, did not constitute interstate commerce, even if true. The postulates were stated in the conjunctive, and it was necessary for the jury to find every one true before they could find for plaintiff. As the jury found certain facts to be true, which we have previously discussed and determined were facts from which an inference arises that plaintiff's intestate was engaged in such commerce at the time of the collision, it is immaterial that the other postulates are hypothesized in the instruction.

XII. It is said that the verdict of $10,000 awarded plaintiff on the first count of the petition is excessive.

The first criticism is that the verdict is presumed to include the full sum of the medical expense of $1464.90, which was not a proper item of damage. We have heretofore disposed of this contention against defendant under Paragraph X of this opinion, and need not discuss it further.

The second criticism is that $8540 for conscious pain and suffering and loss of wages is excessive. Deductions from the evidence advise that the jury probably awarded the sum of $7500 for pain and suffering. Plaintiff's intestate was injured June 15, 1923, and died November 23, 1923. In the interim of over five months, he suffered five major operations, including the amputation of a leg. In the

collision, he sustained, besides the crushing of the leg, a comminuted fracture. Internal injuries also resulted to his lungs, bladder and kidneys, and three ribs were broken. During his sojourn of five and a half months in the hospital, he suffered intense and excruciating pain, and faced death. We cannot say that the verdict was such as to shock the conscience of the court. [Talbert v. Railroad, 15 S. W. (2d) 762.]

It follows that the judgment must be affirmed. It is so ordered. *Henwood* and *Cooley, CC.,* concur.

PER CURIAM:—The foregoing opinion by DAVIS, C., is adopted as the opinion of the court. All of the judges concur.