## GERARDO v. UNITED STATES
### and nine other cases.

Nos. 25081, 25083, 25123, 25266, 25267, 25312, 25413, 25428.

United States District Court
N. D. California, S. D.
Nov. 14, 1951.

Belli, Ashe & Pinney, and Frank J. Baumgarten, all of San Francisco, Cal., Crippen & Flynn, Tacoma, Wash., by Samuel Crippen, Tacoma, Wash., William J. O'Brien, San Francisco, Cal., for libelants.

Chauncey F. Tramutolo, U. S. Atty., San Francisco, Cal., Keith R. Ferguson, Special Asst. to the Atty. Gen., Howard J. Bergman Special Asst. to the U. S. Atty., Stewart Harrison, Atty., Department of Justice, Charles Elmer Collett, Asst. U. S. Atty. San Francisco, Cal., for respondent.

HARRIS, District Judge.

Libelants, heirs of several seamen and two work-a-ways on board the Clarksdale Victory, seek to recover damages against respondent for the negligent operation of the ill-fated vessel. On November 24, 1947,

the Clarksdale Victory ran on the reefs off of Hippa Island, Queen Charlotte Group, B. C. There were but four survivors.

At the lengthy trial, evidence established the fact that the vessel left Alaska on November 22, 1947. On the morning of November 23, it set a course of 132° and shortly thereafter altered such course to 134° at Hinchinbrook. The navigating officer maintained this course until shortly before the disaster which caused the ship to perish. The primary question for the Court to consider in ascertaining negligence is why the ship continued on the southerly course as long as it did and in the manner it did.

On November 24th about 8:30 p. m. the Clarksdale Victory struck an object variously described as a reef or a log. After such striking, the ship altered its course to 145°. Within a period of approximately twenty minutes the vessel crashed on the rocks and reefs off of Hippa Island and sank soon thereafter.[1]

During his pursuance of a course of dead reckoning heading South at 134°, the navigating officer had few radio fixes and was unable to ascertain the ship's specific location. The master believed, by reason of past experience in the same waters, that he was 15 to 25 miles from land at the time of the actual crash. As events turned out, landward drift or set had taken the ship these many miles off of its intended course and placed it in dangerous waters. After 8 p. m. of the evening of the crash, visibility was cut from good (up to 10 miles) to poor (1 mile down to 500 yards) by reason of fog conditions. During the period of minimum visibility, the vessel did not cut its speed from its regular 15½ knots to 16½ knots, nor did it exercise other precautions commensurate with weather and other conditions.

Libelants review and summarize the series of failures on the part of the officers of the ship which led directly or indirectly to the disaster. In addition to their failure to cut speed and otherwise comply with statutory regulations governing operations in fog, they made no use of the lead to ascertain depth. Nor did the officers use the fathometer until the very last moment. They failed to make allowance for set or drift of their ship during the period of navigating on a fixed course. Further, at the very outset of their voyage they failed to lower their booms. Such failure created a condition which made radio beacon

[1]

| Chronology, Last Watch | |
|---|---|
| 8:00 P.M. | Mr. Rasmussen, Third Officer, relieves Mr. Wolfe; wind: between a 4 and 6; visibility: 8–10 miles every direction. Wolfe remains to take bearings. |
| 8:15 P.M. "or shortly before 8:30" | Visibility drops one mile to zero; weather conditions change; wind "appears to increase"; Rasmussen notifies master; speed not reduced; still 15–15½ knots. |
| 8:25–8:30 | Wolfe still in chartroom; apparently does not go to bridge; has no idea of lowered visibility when he leaves for his quarters. His testimony as to time of departure—"a little short of a half hour after 2000". Until this time the object had not been struck. |
| 8:35–8:39 | Vessel strikes object on bottom followed by decided snap rolls, etc.; Captain now on bridge. Tells Rasmussen to lash down instruments in charthouse. Object later described as reef or rocks, causing vessel to shudder. |
| 8:40 | Wolfe now returns to chartroom from his quarters, partially dressed; attempts to use fathometer. States he came up because unusual violence in roll of ship. |
| 8:40–8:45 | Wolfe states change of course came 5–10 minutes before 2050. Course change 11° to 145°; speed still about 15–15½ knots, but course change came after Wolfe returned, not before 8:40. |
| 8:50 | Vessel crashes with violence upon the rocks 500 or less yards from the shore. |

reception less accurate than it otherwise would have been.

The ship's officers, after receiving the warning of striking an object some 20 minutes before the final stranding, and noting heavy swells and wave conditions indicative of nearness to land, failed to turn hard right and head straight to sea.

Respondent seeks to rebut libelants' showing of negligence by observing that the standard of care imposed upon a master and his fellow officers is not the standard of hindsight wisdom, but rather that of the reasonable man under the circumstances at the time of his control of the vessel. Analyzing each act of omission or commission, respondent attempts to explain why the captain and his assistants did what they did and omitted to do those things which libelants contend were crucial for the proper navigation of the Clarksdale Victory.

■ The court is of the view that the several elements of omission established by the evidence combine to characterize the master's control of his vessel as negligent under all of the circumstances. This is especially true after the vessel struck the reef or "log" and was forewarned of likely disaster unless extreme precaution should be taken. Despite heavy fog, ground swells, lack of knowledge as to exact location, and ignorance as to depth, respondent failed to slow down or head to sea. Such failures led directly to the sinking of the Clarksdale Victory. Respondent must be held liable for the loss of lives of the members of the crew and the work-a-ways.

In view of the Court's finding that respondent was negligent in its handling of the Clarksdale Victory immediately prior to the striking of land, the question of damages must be answered. The several individuals who are seeking relief form a mixed group which must be treated, in most cases, upon an individual basis.

Before the court assesses damages, it will make two preliminary observations:

■ (1) Recovery is limited to actual pecuniary loss; there may be no award for consortium. 46 U.S.C.A. § 688; 45 U.S.C.

A. § 51; Chicago Rock Island & Pacific Railroad Co., v. Devine, 239 U.S. 52, 36 S. Ct. 27, 60 L.Ed. 140; Belzoni Hardwood Lumber Co. v. Langford, 127 Miss. 234, 89 So. 919, 18 A.L.R. 1406; Berry v. St. Louis-San Francisco R.R. Co., 324 Mo. 775, 26 S.W.2d 988.

■ (2) In the case of the deceased seamen whose heirs are seeking damages, the court award is in excess of and in addition to the $5,000 war risk insurance policy which has been paid. With respect to decedents Firth and Webb, no war risk insurance policy is involved.

The administrator of the estate of Aquilino Bangloy is awarded the sum of $1,000 damages.

The administrator of the estate of Pablo Gonzales is awarded the sum of $1,200 damages.

The administrator of the estate of James L. Starkey is awarded the sum of $5,500 damages.

The administrator of the estate of Carroll W. Key is awarded the sum of $5,000 damages.

The administratrix of the estate of Martin W. Firth is awarded the sum of $15,000 damages.

The administratrix of the estate of Dallas Warrick Webb is awarded the sum of $16,000.

The administratrix of the estate of James Anthony Kaye is awarded the sum of $9,000.

■ With respect to the administratrix of the estate of Samuel R. Marteen, the court finds that such administratrix, Virginia Marteen, elected to receive an award of compensation under the Employees' Compensation Act and that she received monthly compensation checks for many months after making such election with knowledge of her rights. Under the facts of the case, Mrs. Marteen is precluded from suing respondent for damages. Gibbs v. United States, D.C., 94 F.Supp. 586. Accordingly, the Court makes no award in favor of libelant Virginia Marteen and the libel is dismissed.

Counsel for libelants to whom damages have been awarded will prepare findings of fact and conclusions of law in accordance with this opinion.